UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| REGINALD HARRIS | : | PRISONER |
| | : | NO. 3:02CV0665(DFM) |
| VS. | : | |
| | : | |
| JOHN ARMSTRONG, ET AL. | : | SEPTEMBER 30, 2005 |

## AFFIDAVIT OF EDWARD BLANCHETTE, MD

The undersigned hereby deposes and says:

1. I am over the age of 18 and understand and believe in the obligations of an oath:

2. I am a physician licensed to practice medicine in the State of Connecticut since 1975.

3. I completed my residency in medicine at Saint Francis Hospital, Hartford, Connecticut, in 1977, and completed a Fellowship in Infectious Disease and Microbiology from the University of Connecticut School of Medicine in 1979.

4. I have held various positions with the State of Connecticut Department of Correction (hereinafter "DOC") since 1984, including Hospital Clinical Director at Osborn Correctional Institution, Medical Director at the MacDougall Correctional Institution (hereinafter "MacDougall"), and Acting Director of Health Services and Clinical Practice Coordinator. I am currently the Director of Professional and Clinical Services for the Department of Correction.

5. I am familiar with the medical care and treatment provided to the plaintiff in this case, Reginald Harris, having been consulted regarding his care on various occasions and having reviewed his health records.

**Plaintiffs' Medical History While Incarcerated**

1. The plaintiff has a complex medical history. **Ex. C, Health Records.** While incarcerated, the plaintiff has seen kidney specialists on a regular basis for evaluation and treatment and since 1995 has had regular visits with nephrology specialists at the UCONN renal clinic. **Ex. C 274, 302, 329, 336, 338, 426-27, 437, 438-39, 441-43.**

2. The plaintiff is a diabetic who has required and received chronic dialysis by machine three times weekly since April of 1996 due to his end stage renal disease. **Ex. C 380.**

3. He is also continually monitored for his blood pressure. **Ex. C 328, 307, 316, 328, 336, 338, 343, 694, 696, 698, 700, 809, 820, 827.**

4. The plaintiff has had an extraordinarily high incidence of refusing medical care, including dialysis, and/or declining medication or medical care while in custody. **Ex. C 272, 274, 302, 307, 328-30, 334, 336, 339, 341, 383, 388-89, 398, 399, 404, 435, 490, 497, 500, 502, 506-12, 514, 518-21, 524-25, 527-29, 531, 533-37, 539-42, 545-46, 548, 555, 584, 585, 588-90, 616, 618, 622, 625, 630, 638-40, 647, 649-51, 654, 655-61, 663, 669, 670-73, 691-92, 694-96, 698-700, 710-11, 726-29, 791, 795, 806-10, 815-19, 821, 825-30, 832, 868, 872, 875, 880-899, 906-914, 921, 922-23, 925, 926, 927, 928, 929, 930, 931, 932, 933, 934, 935, 936, 937, 938, 939, 940, 941, 942, 944-48, 994, 998, 1006, 1022-25, 1030-45, 1056, 1063, 1066-75, 1077-78, 1082, 1126-30, 1132-36, 1158, 1186, 1284, 1300, 1305, 1389, 1397-98, 1410, 1414, 1416-17, 1419-20, 1423, 1426, 1428, 1431, 1432-35, 1439, 1452, 1454-55, 1459, 1469, 1647, 1654, 1671-72, 1684, 1691, 1693, 1698-99, 1712, 1714, 1733, 1806.**

5. The plaintiff's refusals have been documented not only within the Department of Correction, but by outside hospitals as well. **Ex. C 718-21, 790, 792-94, 1049-50, 1060, 1062, 1118.**

6. The plaintiff has even refused direct orders from correctional staff to receive medical care, including dialysis. **Ex. C 316, 328, 818.**

7. At one point, due to his own refusal to undergo dialysis, the plaintiff became acutely ill with seizure activity and needed to be hospitalized. **Ex. C 1021-23.** The very day after his discharge, the plaintiff again refused medical services. **Ex. C 1022-25.**

8. Doctors and others providing medical care to inmates have repeatedly counseled the plaintiff in order to persuade him not to decline medical care or fail to comply with prescribed treatment. **Ex. C 329, 337, 537, 819, 910-12, 930, 940.**

9. At one point, Dr. Blanchette requested a mental health consult in order that the plaintiff could be evaluated for competency given that he had refused and been noncompliant with prescribed medication on so many occasions. **Ex. C 911, 1082.**

10. Medication prescribed for the plaintiff has been discontinued due to the plaintiff's repeated noncompliance with a medication regime. **Ex. C 819.** Oftentimes the plaintiff acts out or is uncooperative and/or angry with medical staff attempting to treat and/or transport him. **Ex. C 338, 341, 343, 404, 514, 516, 518, 625, 711, 727, 791, 807, 816, 818, 832 913, 1062, 1305.**

11. On numerous occasions, the plaintiff refused to go to dialysis because he did not care for the officers who would be transporting him or he did not wish to wait to be seen or because he has some sort of conflict with the outside dialysis staff. **Ex. C 524, 533, 541, 545, 589, 821, 1300, 1647.**

12. The plaintiff frequently complained about his meals vis-à-vis dialysis, complaining, for example, that he needed a hot breakfast rather than a cold one. **Ex. C 819; D.** Once he declined dialysis and the reason he reported to the nurse was that he did not have a danish included in his breakfast. **Ex. C 526.**

13. The patient's medical records indicate that he once refused a trip to receive dialysis because he wanted a new jumpsuit for the trip. **Ex. C 542.** One nurse, not a defendant in this lawsuit, noted in plaintiff's record in January of 1999, "I/M [inmate] is never happy with the medical care he gets at any time." **Ex. C 818.**

14. On more than one occasion nurses have referred to the plaintiff as manipulative. **Ex. C 822, 832.** The plaintiff continues to exhibit these behaviors this calendar year. **Ex. C 1647.**

15. Individual doctors providing direct care to inmates do not make final decisions regarding a plaintiff's need for chronic dialysis or for kidney transplant.

16. Such decisions are made by higher level administrators on occasion, and are typically made by the Utilization Review Committee, a committee made up of healthcare professionals who review requests from primary care doctors and para-professionals for specialty patient care and inform the doctor whether such care will be approved or not.

17. For example, when the plaintiff first started receiving chronic dialysis, one of the correctional doctors then treating plaintiff, Dr. Scalise, submitted a Utilization Review Request for chronic dialysis on April 3, 1996. **Ex. C 380, 382.**

18. This request was then approved by the Utilization Review Committee on April 8, 1996. **Ex. C 380.** Dr. Scalise, like any other doctor providing healthcare to inmates, did not

have the authority to order the chronic dialysis himself, nor would any doctor have the authority to order a kidney transplant him or herself.

19. Since the Utilization Review Committee approved the plaintiff's chronic dialysis, it has been an established fact that the plaintiff receives dialysis three times weekly and this has been established at any facility the plaintiff has been housed in. **Exs. A; C 586-87, 592, 601-02, 833, 875, 1002-1003 1063, 1138.**

20. Two weeks before the plaintiff's transfer, the Utilization Review Committee (hereinafter "URC") denied a URC request by a doctor at Northern, Dr. Bianchi, requesting consideration of a transplant. **Ex. C 1248-49.**

21. The response by URC was that the plaintiff would receive "continued dialysis." **Ex. C 1248.**

22. Clearly, the fact that the plaintiff did not receive a kidney transplant while at Garner was not the result of a decision by Dr. Tung, but was a decision by the Utilization Review Committee.

23. The same request had been made the previous year by Drs. Vigneron and Blanchette, who noted that the patient himself requested a referral for a kidney transplant. **Ex. C 1288, 1289, 1295.**

24. The request was denied by URC the previous year as well, with the response being, "Transplant is not first approach to CRF [chronic renal failure] in our facilities." **Ex. C 1288-89, 1295.**

25. The first approach within the State of Connecticut Department of Correction is dialysis, and transplants are only considered if dialysis is insufficient to help the patient.

26. At Garner, the plaintiff was treated by various primary healthcare givers including Drs. Tung and Wright. **Ex. C 1058.** Patients at Garner requiring kidney dialysis are transported to the MacDougall-Walker Correctional Institution for their treatment. Patients in the custody of the Commissioner of Correction are treated with a team approach.

27. The plaintiff personally saw the defendant Nurse Joan Dobson on November 9, 2001 and he indicated only that he felt he was not receiving his psoriasis medicine. **Ex. C 1059.**

28. Within two days, the plaintiff saw Dr. Wright for his psoriasis. **Ex. 1058.** Dr. Wright saw the plaintiff on numerous occasions while he was at Garner. **Ex. C 1060.**

29. The defendant, Dr. Tung, continued to prescribe and/or renew prescriptions for diet and medicines appropriate for the plaintiff's end stage renal disease in the same manner as primary care doctors at other facilities and at Garner. **Ex. C 1085-87, 1089-1112, 1114-1116, 1323, 1324-26, 1331, 1333, 1337-38, 1340-42, 1344-46, 1350-55, 1359-60, 1362, 1364, 1369-70, 1385-86, 1577, 1582, 1585, 1590, 1592, 1598, 1603, 1606, 1629, 1640.**

30. As he had before, the plaintiff continued to refuse treatment during his time at Garner, refusing to come to the medical unit for a physical exam in October of 2001 despite the fact that Nurse Dobson personally went to his cell in order to discuss his refusal with him and persuade him to accept his prescribed treatment. **Ex. C 1060.**

31. Arriving at Garner on June 15, 2005, the plaintiff was dialyzed on June 16 and June 19, 2005. **Ex. C 1062.**

32. The plaintiff continued to receive his routine dialysis while at Garner to the extent he would accept it. **Ex. C 1059-62, 1158-60, 1162-93, 1195-1214, 1217-39, 1244-47, 1464-86, 1489-93, 1495-96, 1500-1503, 1508-33, 1806**

33. The plaintiff's medical record indicates that no paperwork was necessary for plaintiff's dialysis upon his transfer to Garner from Northern. **Ex. C 1063.**

34. On June 21, 2001, within a week of his arrival at Garner, the plaintiff refused dialysis. **Ex. C 1062.** On the very day of his arrival at Garner, the plaintiff reportedly "refused V/S [to have his vital signs taken] pt [patient] rude/angry, refused to allow nurse to [check] L [left] arm fistula." **Ex. C 1062.**

35. The plaintiff continued his refusals while at Garner, either refusing medical treatment outright or refusing all or part of a dialysis session. **Ex. 1158, 1161, 1164, 1169, 1171, 1175, 1186, 1206, 1213, 1214, 1232, 1244, 1261, 1307-09, 1312, 1469, 1475-76, 79, 1503, 1516, 1523, 1529-30, 1806, 1832.**

36. At one point, the plaintiff complained about an insufficient supply of a medication called Lopressor. **Ex. C 1173.**

37. On that very date, Dr. Tung responded by noting that Dr. Wright had reviewed the plaintiff's chart and had increased his Lopressor, which was given to the plaintiff to have on his person, also on that date. **Ex. C 1173.**

38. During his time at Garner, like his time at other facilities, the plaintiff had various issues surrounding his diet and medication. **Ex. C 1226, 1263.** Various healthcare professionals in addition to Dr. Tung dealt with these issues. **Ex. C 1226, 1240, 1311, 1313.**

39. For example, when the plaintiff reported to the dialysis unit that he was out of his blood pressure medicine, Dr. Tung was not notified—rather the note reported, "Talked c/ [with] Nancy in medical Garner C.I." **Exs. C 1226.**

40. Dr. Tung was not personally involved in the day-to-day issues surrounding the plaintiff's hemodialysis. Nephrologists, Drs. Kaplan and Malcolm, oversaw the plaintiff's dialysis, and Dr. Tung along with other healthcare professionals dealt with other primary care issues as they came to their attention. **Ex. C 1242, 1538-41.**

41. Had Dr. Tung jeopardized the plaintiff's life by interfering with his medically necessary kidney dialysis, other nurses and doctors in contact with the plaintiff should and could have addressed the alleged interference. This never happened because it was never necessary. There is no notation anywhere in the health record of the plaintiff that Dr. Tung interfered with the plaintiff's dialysis regimen or related medical care in any way.

42. Dr. Tung was only occasionally involved in the issues of diet and medication surrounding the plaintiff's diabetic condition and was only involved when the medical records so indicate.

43. Dr. Tung's care of the plaintiff was always appropriate, and fell well within the applicable standard of care.

44. On November 30, 2001, Dr. Kaplan completed a "Monthly Hemodialysis Assessment." **Ex. C 1254.** Dr. Kaplan did not note any problems with the plaintiff's hemodialysis. **Ex. C 1254-55.**

45. Dr. Kaplan also completed such a report on June 24, 2002, near the end of plaintiff's year at Garner, as well as on May 29, 2005, December 23, 2001, April 2, 2002, and on January 26, 2002, never noting any problem with the plaintiff's dialysis. **Ex. C 1481, 1488-91, 1498-99, 1504-07, 1534-35.**

46. On October 3, 2001, Dr. Tung noted that the plaintiff was "on HD [hemo-dialysis] 3x/wk ... at MacDougall CI Dialysis Unit." **Ex. C 1257.** Dr. Tung noted that the plaintiff was on certain medicines, and noted that the plaintiff needed surgery as he was unable to dialyze via the "AVF" or fistulogram in his arm. **Ex. C 1257.**

47. Dr. Tung was facilitating the plaintiff's care for his diabetes, not interfering with it.

48. Dr. Tung also facilitated the plaintiff's treatment and coordinated with Dr. Kaplan, the plaintiff's nephrologists, by submitting a request for "non-formulary" medication for the plaintiff pursuant to Dr. Kaplan's orders on more than one occasion. **Ex. C 1305, 1311, 1352, 1357, 1366-67.**

49. The Department of Correction and Correctional Managed Healthcare have, as a cost-saving measure, a list of approved drugs that patients may receive. Medication not on the formulary list must be specially requested and then approved by a committee.

50. While the plaintiff was at Garner, Dr. Tung noted that one of the medications Dr. Kaplan had ordered was non-formulary, and submitted a request accordingly. **Ex. C 1305.** On another occasion, the plaintiff re-faxed a non-formulary request that had not been acted on. **Ex. C 1311.**

51. Dr. Tung also facilitated diet orders by the plaintiff's nephrologists, as did other healthcare professionals at Garner. **Ex. C 1314-19.**

52. Dr. Tung and Nurse Dobson were assigned to Garner during the relevant time period.

53. At MacDougall, the plaintiff not only refused dialysis, but signed a form indicating his request to receive no dialysis whatsoever on November 13, 2002 and stating that he understood that his failure to receive hemodialysis could result in death, congestive heart failure and an number of other dire consequences. **Ex. C 1298-99.**

54. Procardin and Lopressor and high blood pressure medications.

55. There was no medication prescribed for the plaintiff while he was at Garner that assisted his kidney function or his dialysis treatment at the time.

56. Nurse Dobson's response to the plaintiff's grievance dated August 29, 2001, was perfectly adequate, medically appropriate, and did not endanger the plaintiff's life or medical condition in any way.

57. Multi-vitamins, Tylenol and ice treatments are not medically significant in terms of the plaintiff's treatment in 2001, and even if the plaintiff were deprived of these things, this would not interfere with his dialysis treatments.

58. Again, even if the plaintiff were deprived of ice and even if he did not receive tums or skin ointment and even if his forms were not collected as soon as possible, none of these thing would interfere with the plaintiff's dialysis treatments nor would they constitute a breach of the applicable standard of care.

59. Multi-vitamins, Tylenol and ice treatments are not significant in terms of the plaintiff's treatment in 2001, and even if the plaintiff were deprived of these things, this would not interfere with his dialysis treatments.

I swear the foregoing is accurate to the best of my knowledge and belief.

_____
Edward A. Blanchette, MD

Subscribed and sworn to before me this 30th day of September, 200.

_____
Lynn D. Wittenbrink
Assistant Attorney General