UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT


REGINALD HARRIS              :
                             :              PRISONER
       v.                    :   Case No.  3:02CV665(DFM)
                             :
JOHN ARMSTRONG, et al.       :


RULING AND ORDER

The plaintiff, Reginald Harris, brings this civil rights
action *pro se* to challenge his medical care while confined at the
Garner Correctional Institution ("Garner") in Newtown,
Connecticut.[1]

There was a motion to dismiss filed earlier in the case.
After a ruling on that motion,[2] the only remaining defendants are
Dr. Tung and Nurse Joan Dobson ("the defendants").  The plaintiff
claims that they were deliberately indifferent to his serious
medical needs.  He also contends that defendant Dobson failed to

_____

[1]The plaintiff was confined at Garner from June 15, 2001,
through July 1, 2002.  He is currently incarcerated at the
MacDougall-Walker Correctional Institution in Suffield,
Connecticut.  The defendants were employed at Garner.  Thus, the
court assumes that the plaintiff's claims regarding medical
treatment and responses to health grievances relate to the period
during his incarceration at Garner.

[2]On March 31, 2005, the court, Chatigny, D.J., granted the
defendants' motion to dismiss in part.  The court dismissed the
claims for damages against all defendants in their official
capacities, all claims for declaratory and injunctive relief, all
claims against defendant Armstrong and any conspiracy claims.
(See Doc. #39.)

comply with institutional procedures when responding to his
health grievances.  Pending before the court are the defendants'
motion for summary judgment, the plaintiff's cross-motion for
summary judgment and the plaintiff's motion asking the court to
dismiss defendants' motion for summary judgment.  For the reasons
that follow, the defendants' motion is granted and the
plaintiff's motions are denied.

I.   <u>Standard of Review</u>

In a motion for summary judgment, the burden is on the
moving party to establish that there are no genuine issues of
material fact in dispute and that it is entitled to judgment as a
matter of law.  <u>See</u> Rule 56(c), Fed. R. Civ. P.; <u>Anderson v.
Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986); <u>White v. ABCO
Engineering Corp.</u>, 221 F.3d 293, 300 (2d Cir. 2000).  A court
must grant summary judgment "'if the pleadings, depositions,
answers to interrogatories, and admissions on file, together with
affidavits, if any, show that there is no genuine issue as to any
material fact....'"  <u>Miner v. Glen Falls</u>, 999 F.2d 655, 661 (2d
Cir. 1993) (citation omitted).  A dispute regarding a material
fact is genuine "'if the evidence is such that a reasonable jury
could return a verdict for the nonmoving party.'"  <u>Aldrich v.
Randolph Cent. Sch. Dist.</u>, 963 F.2d 520, 523 (2d Cir.) (quoting
<u>Anderson</u>, 477 U.S. at 248), <u>cert. denied</u>, 506 U.S. 965 (1992).
After discovery, if the nonmoving party "has failed to make a

sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party must present "significant probative evidence to create a genuine issue of material fact."  Soto v. Meachum, Civ. No. B-90-270 (WWE), 1991 WL 218481, at *6 (D. Conn. Aug. 28, 1991).  A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986), cert. denied, 480 U.S. 932 (1987).

The court "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought."  Patterson v. County of Oneida, NY, 375 F.3d 206, 218 (2d Cir. 2004).  Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).  See also Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992).  A party may not create a genuine issue of material fact by presenting contradictory or unsupported statements.  See Securities & Exchange Comm'n v. Research Automation Corp., 585

F.2d 31, 33 (2d Cir. 1978).  Nor may he rest on the "mere allegations or denials" contained in his pleadings.  Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).  See also Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible).  A self-serving affidavit which reiterates the conclusory allegations of the complaint in affidavit form is insufficient to preclude summary judgment.  See Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990).  In addition, "'[t]he mere of existence of a scintilla of evidence in support of the [plaintiffs'] position will be insufficient; there must be evidence on which the jury could reasonably find for the [plaintiffs].'"  Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004) (quoting Anderson, 477 U.S. at 252).

Where one party is proceeding pro se, the court reads the pro se party's papers liberally and interprets them to raise the strongest arguments suggested therein.  See Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).  Despite this liberal interpretation, however, a "bald assertion," unsupported by evidence, cannot overcome a properly supported motion for summary judgment.  Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

When cross-motions for summary judgment are presented to the

court, summary judgment should not be granted "unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely in dispute." Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975).

II.  Facts[3]

A.  Medical Treatment

The plaintiff suffers from kidney disease.  The defendant Dr. Tung is a prison doctor and, as such, does not have the authority to approve treatment such as kidney dialysis or a kidney transplant.  Decisions regarding whether an inmate should receive specialty treatment such as dialysis for chronic kidney disease or a kidney transplant are made by the Utilization Review Committee ("URC").  If a prison doctor deems specialty treatment to be advisable, he may submit a request for that treatment to the URC.  The URC reviews the request and informs the doctor whether the request has been approved or denied.

For prisoners who require medication, prison doctors may prescribe routinely only those medications on a list of approved medications.  Any medication not included on the list is referred to as a "nonformulary" medication and may be prescribed only with prior approval from a designated committee.

_____

[3]The facts are taken from the defendants' Local Rule 56(a)1 Statement [doc. #53-2] with supporting exhibits and affidavits and the plaintiff's Local Rule 56(2)2 Statement [docs. ## 56-1, 57-2] with supporting exhibits.  The court also considers the exhibits attached to the original complaint.

In 1996, the plaintiff's then treating prison doctor obtained approval from the URC for the plaintiff to receive kidney dialysis.  Since 1996, the plaintiff has been undergoing dialysis treatment three times per week.[4]  A physician from the University of Connecticut Health Center who is a kidney specialist supervises his dialysis treatments, prescribes medications for the plaintiff and makes recommendations concerning diet and fluid intake.

According to the plaintiff's medical records, the plaintiff has declined medications and refused medical care (including dialysis treatments) on numerous occasions throughout his period of incarceration.  The plaintiff concedes he has refused treatment.  He explains that he might have declined medical treatment to avoid the $3.00 charge imposed on inmates for sick call visits.  He says he refused medication only when the kidney specialist changed his medication but that order had not yet been communicated to the correctional facility.  He admits refusing to go to dialysis, but says he did so because correctional staff wanted to apply restraints to his left forearm, the location of a surgically implanted shunt and fistula.  He also refused to go to dialysis twice when he was provided a dirty jumpsuit to wear when

---

[4]Initially, the plaintiff underwent dialysis treatments at St. Francis Hospital in Hartford, Connecticut.  After a dialysis unit was established at MacDougall-Walker Correctional Institution, the plaintiff received his dialysis treatments at that facility.

leaving the correctional facility and, at least once, when he did not like the correctional officers who were to transport him.

Before he was transferred to Garner, the plaintiff's treating prison doctors twice submitted requests to the URC that the plaintiff undergo a kidney transplant.  The URC denied both requests and indicated that the plaintiff should continue dialysis.  The second denial occurred approximately two weeks before the plaintiff was transferred to Garner.  The URC's decisions to deny the transplant were consistent with its practice of treating kidney disease with dialysis and approving requests for kidney transplants only if dialysis did not help the patient.  Neither of the defendants played any role in denying the requests for a kidney transplant.

The plaintiff's primary treating physician at Garner was Dr. Wright.  The defendant Dr. Tung examined the plaintiff twice, in June 2001 and April 2002.  At various times, Dr. Tung renewed prescribed medications or sought approval for nonformulary medications prescribed by the kidney specialist.[5]  In June 2001 and June 2002, Dr. Tung entered orders regarding the plaintiff's diet.  In February 2002, Dr. Tung denied the plaintiff's request for a special mattress and a double mattress because these items were not medically indicated.

---

[5]Dr. Tung entered medication orders on June 19, 2001, October 15, 2001, February 27, 2002, March 1, 2002, April 22, 2002, May 1, 2002, May 21, 2002 and June 11, 2002.

7

Prior to the plaintiff's transfer to Garner in June 2001, doctors had ordered that he could be handcuffed, but not shackled on his left upper extremity when he went to dialysis.  (See Defs.' Mem., Doc. #53, Ex. C at 972 (may be cuffed on both wrists but no black box on left wrist for dialysis from May 15, 2000 indefinitely) & 1027 (no shackle on left from May 22, 2000 indefinitely); Pl.'s Statement of Material Facts, Doc. #57-2, Ex. A at 3 (on May 12, 2000, doctors authorized use of handcuffs on both wrists); but see Defs.' Mem., Doc. #53, Ex. C at 1046 (no handcuff on left from May 11, 2000, through November 11, 2000). On May 21, 2002, while he was confined at Garner, a nurse treated a small abrasion over the shunt site on the plaintiff's left arm. The following day, the plaintiff refused to go to dialysis.  The plaintiff noted on the refusal form that no handcuffs were allowed on his left wrist and that hygiene was inadequate.  (See Defs.' Mem. Ex. C at 1309-10.)

On June 21, 2002, the plaintiff wrote a letter to the warden complaining about being handcuffed on his left wrist.  In the letter, the plaintiff complained that Dr. Tung refused to sign an order that he not be handcuffed on the left wrist. (See Pl.'s Statement of Material Facts, Ex. 57-2, Ex. E at 39.)  That same day, the kidney specialist requested that the plaintiff not be handcuffed on his left forearm.  (See Pl.'s Statement of Material Facts, Ex. 57-2, Ex. C at 10.)  There is no entry in the medical

records that Dr. Tung saw the plaintiff on May 21, 2002.

Defendant Dobson was the nursing supervisor and the health grievance coordinator at Garner while the plaintiff was confined there.  The medical records reveal that defendant Dobson saw the plaintiff in his cell block on October 3, 2001 after the plaintiff refused to go to the medical unit for a physical examination.  The plaintiff, who appeared in no apparent distress, refused to get off his bunk and speak to her.  On November 9, 2001, defendant Dobson saw the plaintiff to discuss medical issues.  She scheduled the plaintiff to see Dr. Wright for his psoriasis and ordered other medications for him.

B.   Health Grievances

The plaintiff challenges the manner in which his health grievances were handled.  While he was confined at Garner, the plaintiff submitted many health grievances.  The evidence submitted by the parties indicates that defendant Dobson responded to ten of the plaintiff's health grievances.[6]

In July and September 2001, the plaintiff submitted health grievances complaining about delays in receiving medication for chronic psoriasis.  Defendant Dobson denied both grievances

---

[6]Defendant Dobson states in her affidavit that her review of grievance logs revealed four health grievances submitted by the plaintiff.  The evidence shows she actually responded to ten grievances.  Defendant Dobson responded to grievances dated July 18, 2001, August 28, 2001, September 30, 2001, November 30, 2001, April 1, 2002, April 3, 2002, April 21, 2002, May 5, 2002, May 17, 2002 and May 26, 2002.

because the plaintiff had been provided supplies of medication prior to the dates on which the grievances were denied. Defendant Dobson reminded the plaintiff that he should ask the medical department to reorder his medications three to four days before his medication ran out to compensate for the time it took for the pharmacy to order and receive the medications.

In August and November 2001, the plaintiff submitted health emergency grievances, requesting various medications, shampoo, vitamins and ice chips. In each instance, defendant Dobson observed that the subject of the grievance was not a true emergency and noted that the plaintiff had received the medications and other items. Defendant Dobson received the August emergency health grievance on September 4, 2001 and marked it "compromised" two days later; she received the November 2001 emergency health grievance on December 4, 2001 and denied it two days later.

In April 2002, the plaintiff filed two grievances in which he did not seek any medical treatment. Instead, he asked that a particular nurse be reprimanded. Defendant Dobson denied both grievances. Also in April 2002, the plaintiff submitted a health emergency grievance in which he complained that he had arrived late for a dialysis treatment and his new prescription for multivitamins was delayed. He also requested permission to purchase a fan. Defendant Dobson received this grievance on

April 25, 2002 and marked it "compromised" on May 6, 2002.  She again observed that the conditions complained about were not true health emergencies.  The plaintiff's transportation was arranged by custody staff, not the medical department; he had received a supply of medication; and there was no need to purchase a fan as the facility was air-conditioned.

Defendant Dobson also responded to an institutional grievance regarding the plaintiff's meals and a health grievance complaining that a nurse failed to take his blood pressure and provide him as much ice as he wanted.  Defendant Dobson verified that the plaintiff's meals were prepared in accordance with guidelines supplied by the University of Connecticut Health Center.  She also informed the plaintiff that he should ask to speak with a nursing supervisor if a nurse refused to take his blood pressure; he should not wait and later submit a health grievance.  Finally, defendant Dobson advised the plaintiff that the amount of ice he was provided each day was in accordance with the doctor's orders.

The plaintiff submitted his last health emergency grievance in late May 2002.  Defendant Dobson received the grievance on June 5, 2002 and denied it the following day.  The plaintiff complained that he was not permitted to keep his medications in his cell.  At this time, the plaintiff was housed in a unit that did not permit inmates to retain a supply of any medication.  The

11

plaintiff's medical records indicated, however, that he had received all of his medications.

III. <u>Discussion</u>

The plaintiff seeks damages from defendants Tung and Dobson for deliberate indifference to his serious medical needs and from defendant Dobson for failing to comply with institutional grievance procedures.  The plaintiff moves for entry of judgment in his favor on all claims.  The defendants move for summary judgment on the grounds that defendants Dobson and Tung were not deliberately indifferent to his serious medical needs and were not personally involved in some of the claims contained in the amended complaint.  They also argue that the plaintiff has not exhausted his administrative remedies with regard to all claims and that defendants Tung and Dobson are protected by qualified immunity.

A.   <u>Personal Involvement</u>

The plaintiff argues that defendant Tung denied him a kidney transplant.  The defendants contend that defendant Tung was not personally involved in the decisions denying a kidney transplant.

It is settled law in this circuit that in a civil rights action for monetary damages against a defendant in his individual capacity, a plaintiff must demonstrate the defendant's direct or personal involvement in the actions which are alleged to have caused the constitutional deprivation.  See <u>Wright v. Smith</u>, 21

F.3d 496, 501 (2d Cir. 1994).

The evidence demonstrates that no doctor employed by the Connecticut Department of Correction has the authority to decide whether an inmate should undergo a kidney transplant.  That decision is reserved to the URC.  The URC denied the requests of plaintiff's doctors for a kidney transplant in favor of continued dialysis.  Dr. Tung played no role in the denial of a kidney transplant for the plaintiff.  The defendants' motion for summary judgment is granted on the claim that the Dr. Tung denied the plaintiff a kidney transplant.

B.   Deliberate Indifference to a Serious Medical Need

In his amended complaint, the plaintiff alleges that defendants Tung and Dobson were deliberately indifferent to his serious medical need in several ways:  Dr. Tung denied him dialysis treatment; Dr. Tung disregarded medication orders and recommendations for care from the kidney specialist; Dr. Tung refused to see the plaintiff despite recommendations for examination from the nursing staff; Dr. Tung discontinued several medications without prescribing substitutes; defendant Dobson denied the plaintiff things that would ease his medical problems; and defendant Dobson delayed responding to health grievances.

Deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment.  See Estelle v. Gamble, 429

13

U.S. 97, 104 (1976).  To prevail on such a claim, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference" to his serious medical need.  Id. at 106.  He must show intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain by prison personnel.  See id. at 104-05

Mere negligence will not support a section 1983 claim; "the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law."  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003).  Thus, "not every lapse in prison medical care will rise to the level of a constitutional violation," id.; rather, the conduct complained of must "shock the conscience" or constitute a "barbarous act."  McCloud v. Delaney, 677 F. Supp. 230, 232 (S.D.N.Y. 1988) (citing United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2d Cir. 1970)); see also Estelle, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); Tomarkin v. Ward, 534 F. Supp. 1224, 1230 (S.D.N.Y. 1982) (holding that treating physician is liable under the Eighth Amendment only if his conduct is "repugnant to the conscience of mankind.").

Inmates do not have a constitutional right to the treatment of their choice.  See Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986).  Thus, mere disagreement with prison officials about

what constitutes appropriate care does not state a claim cognizable under the Eighth Amendment.  See Ross v. Kelly, 784 F. Supp. 35, 44 (W.D.N.Y.), aff'd, 970 F.2d 896 (2d Cir.), cert. denied, 506 U.S. 1040 (1992).

There are both subjective and objective components to the deliberate indifference standard.  See Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994), cert. denied sub nom. Foote v. Hathaway, 513 U.S. 1154 (1995).  The alleged deprivation must be "sufficiently serious" in objective terms.  Wilson v. Seiter, 501 U.S. 294, 298 (1991).  See also Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting) ("'serious medical need' requirement contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain").  The Second Circuit has identified several factors that are highly relevant to the inquiry into the seriousness of a medical condition: "'[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'"  Chance v. Armstrong, 143 F.3d 698, 702 (2d. Cir. 1998) (citation omitted).

In addition to demonstrating a serious medical need to satisfy the objective component of the deliberate indifference standard, the plaintiff also must present evidence that,

subjectively, the charged prison official acted with "a sufficiently culpable state of mind."  Hathaway, 37 F.3d at 66. "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  Id. (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

The judgment of prison doctors is presumed valid unless the prisoner provides evidence that the decision was "such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." White v. Napoleon, 897 F.2d 103, 113 (3d Cir. 1990).  See also Sond v. St. Barnabus Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) (stating that federal courts are "hesitant to second guess medical judgments" and afford determinations of medical providers a "presumption of correctness") (citations and internal quotation marks omitted).

Claims regarding "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention" implicate medical judgment.  Id.  Thus, the claims are at most,

16

negligence claims involving medical malpractice and not the subject of a section 1983 action.  See id. (citing Estelle v. Gamble, 429 U.S. 97, 107 (1976)).

The plaintiff suffers from psoriasis and chronic kidney disease requiring dialysis.  For the purpose of this ruling, the court will assume that the plaintiff's medical conditions are serious.

To establish a genuine issue of material fact regarding the second component of the deliberate indifference test, the plaintiff must present evidence demonstrating that defendants Tung and Dobson were aware of and deliberately disregarded a serious risk to his health.  He has not done so.

### 1. Dr. Tung

The plaintiff claims that Dr. Tung was deliberately indifferent to his need for treatment for chronic kidney disease in several ways.  The court considers each claim below.

### a.   Denial of Dialysis Treatment

The plaintiff first contends that Dr. Tung denied him dialysis treatments.  The plaintiff has neither identified any entries in his medical records nor provided other evidence showing that Dr. Tung refused to permit the plaintiff to attend dialysis and the court has been unable to locate any relevant evidence.  He has provided, however, a copy of a letter he wrote to Warden Gomez on June 21, 2002.  In the letter, the plaintiff

17

stated that Dr. Tung refused to issue an order that the plaintiff cannot be handcuffed on his left wrist.   (See Pl.'s Statement of Material Facts, Ex. 57-2, Ex. E at 39.)   Thus, the court considers the claim to be that Dr. Tung was deliberately indifferent to the plaintiff's need for dialysis by refusing to order that he not be handcuffed on his left wrist.

The plaintiff has provided no objective evidence to support this claim.   Despite his assertions to the contrary, the orders regarding handcuffing in the medical records distinguish between the application of handcuffs and shackles and indicate that, except for a period in 2000, the plaintiff could be handcuffed on both wrists when he was transported to dialysis.   (See Defs.' Mem., Doc. #53, Ex. C at 972 (may be cuffed on both wrists but no black box on left wrist for dialysis from May 15, 2000 indefinitely) & 1027 (no shackle on left from May 22, 2000 indefinitely); Pl.'s Statement of Material Facts, Doc. #57-2, Ex. A at 3 (on May 12, 2000, doctors authorized use of handcuffs on both wrists).   The plaintiff has provided no evidence that he saw Dr. Tung on June 21, 2002, or that he requested such an order from Dr. Tung at any time while he was confined at Garner.   The only references to a prohibition against handcuffing are statements in the plaintiff's handwriting.

The kidney specialist did request that the plaintiff not be handcuffed on his left forearm.   To the extent that the

plaintiff's claim may be construed as a failure to follow the kidney specialist's request, the claim fails.  First, the kidney specialist did not make his request until June 21, 2002.  The medical records indicate that Dr. Tung did not examine the plaintiff after April 2002 and last issued medication orders on June 11, 2002.  There is no reference to any telephone consultation regarding handcuffing on June 21, 2002.  Thus, the plaintiff fails to present any evidence to support a claim that Dr. Tung deliberately ignored this recommendation.

Further, even if Dr. Tung had refused to issue such an order, the alleged refusal and the request from the kidney specialist constitute, at most, a difference of medical opinion regarding treatment, which is not cognizable under section 1983.  See Estelle v. Gamble, 429 U.S. 97, 107 (1976); Sond v. St. Barnabus Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 311-12 (S.D.N.Y. 2001).

Thus, the plaintiff fails to present any objective evidence in support of his own motions or in opposition to defendants' motion for summary judgment on his claim that Dr. Tung interfered with his ability to go to dialysis treatments.  The defendants' motion for summary judgment is granted on this claim.

       b.   Medication and Treatment Recommendations

The plaintiff next argues that Dr. Tung disregarded medication orders and treatment recommendations from the kidney

specialist and that he discontinued some medications without prescribing substitutes.  He also contends that Dr. Tung disregarded the dialysis nurse's recommendations that the plaintiff receive ice chips and be provided a special mattress.

The plaintiff does not provide any evidence of specific medication orders that were disregarded or identify medications that were discontinued without substitute.  Defendants, on the other hand, point to many entries in the medical records where Dr. Tung requested approval of nonformulary medications prescribed by the kidney specialist.  The plaintiff has not met his burden of providing evidence in support of his motions and in opposition to defendants' motion for summary judgment creating a genuine issue of material fact that Dr. Tung disregarded specific medication orders or discontinued medications without prescribing substitute medications.

Even if the plaintiff had provided some evidence to support these allegations, claims regarding disagreements over medications implicate medical judgment.  These allegations only constitute negligence which is not cognizable under section 1983 and must be addressed in a medical malpractice action in state court.  See Estelle v. Gamble, 429 U.S. 97, 107 (1976).

The plaintiff argues that he was not provided ice chips as requested by the dialysis nurse.  In support of this argument, the plaintiff provides various documents, most of which concern

difficulties obtaining ice chips at times not relevant to this action.  During the relevant period, the plaintiff provides one request, dated November 30, 2001, from the dialysis nurse that he be permitted ice chips.  That same day, the issue was addressed by Dr. Wright.  The plaintiff also provides a copy of a medication pass issued March  20, 2002.  Although there is no indication on the pass revealing its purpose, the plaintiff states that the pass entitled him to receive ice chips every night.  The plaintiff has provided no evidence that Dr. Tung failed to comply with any recommendation that he receive ice chips or interfered with the orders enabling him to receive ice chips.

Further, even if the plaintiff had provided such evidence, he also has filed a document indicating that as of November 12, 2002, Dr. Blanchette, in consultation with the kidney specialist, determined that ice chips were not necessary for treatment and discontinued all orders for ice chips.  (See Pl.'s Statement of Material Facts, Doc. #57-2, Ex. E at 5c.)  Failure to comply with an order that is not medically necessary would not constitute disregarding a serious risk to the plaintiff's health.  Thus, the plaintiff has not provided evidence to satisfy the subjective component of the deliberate indifference test regarding his claim for denial of a sufficient amount of ice chips.

The plaintiff also argues that Dr. Tung did not order that

he receive a special mattress or a double mattress.  The medical records indicate that the plaintiff asked Dr. Tung for a special mattress in February 2002.  Dr. Tung denied the request because, after examining the plaintiff, he determined that a special mattress or a double mattress was not medically indicated.  (See Defs.' Mem., Doc. #53, Ex. C at 1313.)

The judgment of prison doctors is presumed valid.  See White, 897 F.2d at 113.  The plaintiff has not provided any evidence to overcome this presumption, namely, evidence showing that Dr. Tung's decision was "such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that [Dr. Tung] actually did not base the decision on such judgment."  Id.  Further, this claim involves a disagreement about medical treatment.  As such, it is not cognizable under section 1983.

The defendants' motion for summary judgment is granted as to the claims that Dr. Tung disregarded medication orders and treatment recommendations and that he discontinued some medications without prescribing a substitute.

c.   Failure to Examine

Finally, the plaintiff claims that Dr. Tung refused to see the plaintiff when examination was recommended by a nurse.  The plaintiff does not identify any entry in his medical records that supports his allegations.  In addition, the plaintiff concedes in

his Local Rule 56(a)2 Statement that he was treated primarily by Dr. Wright, not Dr. Tung.  (See Doc. #56-1 at ¶ 35.)  Thus, any request by the nurse for examination presumably would result in examination by Dr. Wright.

The court concludes that the plaintiff has failed to meet his burden of presenting evidence in support of this claim. Defendants' motion for summary judgment is granted as to the claims that Dr. Tung failed to examine the plaintiff.

### 2. Nurse Dobson

The plaintiff contends that the manner in which defendant Dobson handled his health emergency grievance rises to the level of deliberate indifference to his serious medical needs.  He also argues that defendant Dobson denied him medically necessary items.

### a.   Recharacterization of Emergency Grievances

The plaintiff argues that defendant Dobson was deliberately indifferent to his serious medical needs because she recharacterized his health emergency grievances as non-emergencies to enable her to delay responding to his concerns for thirty days, thereby delaying his treatment.

Department of Correction Administrative Directive 9.6 governs the inmate grievance procedure. (See Defs.' Mem., Doc. #53, Ex. M (version in effect at time of incident) & N (current version).)  Directive 9.6, section 18(C) provides that an

emergency grievance requiring a substantive response from outside the housing unit shall receive a response in two business days and a written response in five business days.  Because health emergency grievances require responses from the medical unit, this time limit applies.  The directive does not indicate whether the time commences when the inmate prepares the emergency grievance or when the grievance is received.

The record indicates that the plaintiff submitted four health emergency grievances.  As defendant Dobson commented, the first three did not concern true emergencies.  The plaintiff's first health emergency grievance is dated August 28, 2001. Defendant Dobson received the grievance on September 4, 2001 and marked it compromised on September 6, 2001.  The grievance was resolved within six business days from the date of the grievance and within two business days from the date it was received.

The second health emergency grievance is dated November 30, 2001.  Defendant Dobson received it on December 4, 2001 and denied the grievance two days later.   The grievance was resolved within four business days from the date of the grievance and two business days from the date it was received.

Defendant Dobson received the plaintiff's April 21, 2002 health emergency grievance on April 25, 2002 and marked it compromised on May 6, 2002.  The grievance was resolved ten business days after the date the grievance was prepared and six

business days after it was received.

On June 5, 2002, defendant Dobson received the plaintiffs'
health emergency grievance dated May 26, 2002.  She denied the
grievance on June 6, 2002.  The grievance was denied eight
business days after it was prepared and one business day after it
was received.

The record demonstrates that defendant Dobson did not
recharacterize any of the health emergency grievances as non-
emergencies to delay resolution of the issues.  The longest time
from preparation of a health emergency grievance to its
resolution was ten days.  The court concludes that the plaintiff
has failed to present any evidence to support his claim that
defendant Dobson was deliberately indifferent to his serious
medical needs because she recharacterized his health emergency
grievances to delay responding to his concerns for thirty days.

b.   <u>Denial of Recommended Items</u>

The plaintiff also argues that defendant Dobson denied him
items that would ease his medical problems.  In support of his
claim, he provides copies of many requests for various items and
medications.  Some of the requests do not include a response;
several others include responses from other nurses.  The
plaintiff has provided no evidence that these requests were
submitted to defendant Dobson or that she was made aware of the
requests.

25

Further, defendant Dobson's responses to the plaintiff's health grievances indicate that she repeatedly reviewed the plaintiff's medical records and determined that he already had received needed medications or ensured that he did receive them. Although the plaintiff disagrees with her decisions regarding the amount of ice chips that he was permitted by doctor's order and whether he should be permitted to have a fan, he has provided no evidence suggesting that defendant Dobson was aware of and disregarded an excessive risk to the plaintiff's health. Thus, defendants' motion for summary judgment is granted as to the claim that defendant Dobson denied the plaintiff needed medical items.

    C.  <u>Failure to Comply with Grievance Procedures</u>

Finally, the plaintiff argues that defendant Dobson violated institutional grievance procedures by failing to treat his health emergency grievances as such. The procedures for reviewing grievances are set forth in Department of Correction Administrative Directive 9.6. The plaintiff's claim that defendant Dobson failed to comply with these procedures when reviewing his health emergency grievances is not cognizable.

"A state cannot be said to have a federal due process obligation to follow all of its procedures; such a system would result in the constitutionalizing of every state rule, and would not be administrable." <u>Levine v. Torvik</u>, 986 F.2d 1506, 1515

26

(6th Cir. 1993)(citing <u>Engle v. Isaac</u>, 456 U.S. 107 (1982)),

<u>overruled in part on other grounds by</u> <u>Thompson v. Keohane</u>, 516

U.S. 99, 111 (1995).  This district has previously applied the

reasoning of the Sixth Circuit to hold that failure of a

correctional official to comply with the institutional grievance

procedures is not cognizable in an action filed pursuant to 42

U.S.C. § 1983, unless the action caused the denial of a

constitutionally or federally protected right.  <u>See</u> <u>Ruocco v.</u>

<u>Tung</u>, No. 3:02cv1443(DJS), 2004 WL 721716, at *14 (D. Conn. Mar

30, 2004); <u>Hunnicutt v. Armstrong</u>, 305 F. Supp. 2d 175, 188 (D.

Conn. 2004) (grievance procedure).

The plaintiff contends that defendant Dobson's

recharacterization of his health emergency grievances as ordinary

health grievances delayed the resolution of his claims.  The

court has considered above any possible claim that the delay in

responding to the health emergency grievances constituted

deliberate indifference to the plaintiff's serious medical need.

Because the court cannot discern any other constitutional or

federally protected right that is implicated by a delay in

responding to a health emergency grievance, all other claims for

violation of state grievance procedures are not cognizable in

this action.  Defendants' motion for summary judgment is granted

as to all other claims against defendant Dobson for failing to

timely respond to the plaintiff's health emergency grievances.

IV.   Conclusion

The defendants' motion for summary judgment [**doc. #53**] is **GRANTED**.   The plaintiff's motions for summary judgment [**docs. ##55, 57**] and motion to dismiss defendants' motion for summary judgment [**doc. #60**] are **DENIED**.   The Clerk is directed to close this case.

This is **not** a recommended ruling.   The parties have consented to the exercise of jurisdiction by a magistrate judge and the case was transferred to the undersigned for all purposes on July 18, 2005.   (See Doc. #49.)

**SO ORDERED** this 31ˢᵗ day of March 2006, at Hartford, Connecticut.

 /s/ Donna F. Martinez
DONNA F. MARTINEZ
UNITED STATES MAGISTRATE JUDGE